Case number 15-1054 et al. Center for Biological Diversity et al. Petitioners versus Environmental Protection Agency. Mr. Evans for the petitioners, Mr. Jacobi for the respondents, Ms. Berman for the interviewers. Morning, counsel. Mr. Evans, please proceed when you're ready. Good morning, your honors. May it please the court. Jonathan Evans for petitioners. I'd like to reserve three minutes for rebuttal. I'll be stopping at the unless your honors have questions. I'll first address today why this court should enter the proposed order providing deadlines for the Environmental Protection Agency to comply with the Endangered Species Act. This case presents a unique opportunity where all of the parties are aligned and asking the court to effectuate a carefully balanced approach to resolve this case. Should the court decline to enter that order, setting deadlines, I'll focus on why vacating the four registrations that still remain at issue in this case is the appropriate outcome here. At the outset, petitioners urge the court to follow the clear path forward set by all the parties to this case and enter an order setting deadlines for EPA's compliance with the Endangered Species Act for the remaining four pesticides at issue in these consolidated cases and effectuate the settlement agreement. The settlement agreement has already borne fruit through label changes to the pesticide for keeping the product available but under safer uses. Entering the proposed order would also trigger enhanced environmental protections in the settlement agreement, such as the establishment of an interactive geographically based website detailing locations for ESA protected species that could be affected by the four pesticides and steps to mitigate harms in those specific locations. It also establishes a meet and confer process after the draft biological evaluations are by the Environmental Protection Agency, the first step in their compliance with the Endangered Species Act here, to allow the parties to negotiate potential future mitigations to reduce harm to Endangered Species Act listed species, like happened with N. cuprosiidae, to streamline the future consultation process and reduce harm and allow the pesticides to remain on the market. It would also provide important regulatory certainty to the regulated community and to EPA. Without a court order, future benefits from the settlement agreement become null and void. Can I just ask one technical question? So for the pesticide that's already been dealt with, it's cuprosiidae, I think? Correct. I take it that is everybody on board with dismissing that petition as moot? Petitioners agree that EPA met its ESA obligations by changing the labels to reduce the harms to affect determination. So there's no effect on Endangered Species. Petitioners are not disputing that determination. And is the consequence of that then that the petition associated with that one would be dismissed as moot? Dismissed, your honor, whether the decision was made as a result of the party's settlement agreement or mootness is something that we haven't negotiated with the other side, but we do agree that that's no longer an issue here. Okay. Mr. Evans, can you explain for me what are the advantages that you believe the parties gained by the court retaining jurisdiction over this? That's a good question, your honor. As the briefing shows, unfortunately, the Environmental Protection Agency has had substantial challenges in complying with the Endangered Species Act. And we've seen consistently when EPA has complied with the Endangered Species Act after it has been resulted in litigation, it's only been when the court has enforced and has proposed deadlines for EPA to act. Unfortunately, when the court has remanded without vacater and not retained jurisdiction of EPA's actions, such as the case of the cyanotronochal pesticide, which is a Center for Biological Diversity versus EPA 861 F3D 174, the petitioners have been forced to return to this court to seek redress for EPA's continued violations of the law. EPA's failure to comply with both the congressional mandate of the ESA and this court's remand order require petitioners to once again return to this court last year, over four and a half years after the court's remand order, and eight years after initial registration, to enforce the rule of law by filing a petition for writ of mandamus in Reeves Center for Biological Diversity, case number 21-1270 in this circuit. Enforcing the petitioners to return to the court strains judicial resources of a clear remand order that the agency should have complied with. It also provides an improper burden for petitioners. How does the consent order make it easier for you to get relief if the EPA continues to miss deadlines? By the court retaining jurisdiction, we simply... The consent order does two things. It provides deadlines. Well, I guess two things. It provides deadlines, it retains jurisdiction, and it allows the settlement agreement to be effectuated. By the court retaining jurisdiction, the agency has been demonstrated that it's incentivized to act. When the court doesn't retain jurisdiction and doesn't provide deadlines, we simply see each EPA's priorities changing, but they don't really address the court's clear remand order. So that's why we think it's crucial that the court retain jurisdiction in order to... Is that really a problem with the remand without vacator remedy itself? Well, absolutely. I mean, the science removal decision is a concrete example of how EPA has kind of unfortunately flaunted the court's order here and the congressional mandate. So we have to return and then come back and seek a petition for writ. The whole time EPA's violations of the law are ongoing, harm to endangered species are occurring, and we just don't think that that's the appropriate judicial outcome. And also looking at what the Endangered Species Act requires, which is allowing ongoing harm to endangered species to occur. We do think that making sure that the agency does comply with this court's remand is important. And unfortunately, the record here and EPA's history demonstrates that it has had shifting priorities in complying with the Endangered Species Act. Mr. Evans, what happens with the merits claim and the maximally available relief for your clients under three scenarios? One, I guess we can rule against you. The other, we rule in your favor and remand without vacature. And so really, it's just that we remand without vacature. And in the latter, how would you, or in either situation, I'm sorry, how would you prompt the court to, for example, decide to vacate these registrations? I mean, that's sort of in the background, that's your cudgel, right? And I guess I'm wondering the fate of that under the scenarios. If I could just clarify the question, Judge Pillard, you asked it. Thank you for indulging me. The two questions were, or two paths were, if the court remands without vacater, what do we do? If the court maintains their case in advance while EPA complies, what do we do if EPA doesn't comply? Yeah. I mean, it seems to me that the availability or the prospect or the risk from EPA's and intervenors' perspective that a court might hold that these registrations are invalid is somewhere in the mix. It's just not entirely clear to me where it is in the mix under the alternative scenarios. Does that make sense? I know that's- I think so. If EPA fails to comply with the consent orders, their proposed orders and the consent decree, that settlement agreement doesn't become effectuated. This is under the scenario two. We go back to the court, either asking for EPA's compliance or asking for the court to vacate the pesticides because EPA has continued to demonstrate it won't comply with this court's deadlines. We don't think that that is likely. We certainly hope that it is likely. In EPA's history, it hasn't demonstrated that's the case. Under the remand without vacater scenario, we do what we did in Scientronical and come back and have to ask the court to issue an order deadline, which we already have here. In other words, we can really achieve the outcome that is most beneficial for the parties, most efficient for the court, and enhances environmental protections here without having to string this case along, which has already been protracted for many years through a petition for writ of mandamus as we had to do in the Scientronical case. It could be remanded without vacater but with deadlines. It could, Your Honor. The settlement agreement does provide for that. It requires deadlines but does require the court maintaining jurisdiction. We do feel that maintaining jurisdiction is essential for making sure that the agency does comply with the law. I thought your position in your briefing was that you were not on board with that. That's not part of the settlement as you negotiated it. It is not part of the settlement as we negotiated. If the court does remand without vacater and deadlines, we'd have to evaluate how we can potentially salvage the settlement agreement if it's possible because we do think it still has merits. We do think it's important in order to streamline the potential beneficial outcome for all parties, enhance environmental protection, just to move forward with deadlines and jurisdiction because that's what has demonstrated that EPA will act to comply with the law in the past. Why wouldn't it work? I'm not suggesting that we necessarily have to do that but I'm not quite understanding if we remand without vacater but have deadlines, which are the deadlines that have been negotiated now. That sort of thing has been done before where the court has remanded without vacater and then had a deadline in effect pursuant to which a lapse of the deadline would mean that the relevant instrument would be treated as vacated. The registration would get vacated if the agency hasn't taken action in concert with our decision by the deadline. That doesn't work because it really places an unfair burden on petitioners to come back with a petition for writ to achieve the extraordinary remedy of a writ of mandamus. We have to argue the track factors and if the court issues a deadline, it does say that that is a reasonable time frame within which to react, but we do just think that it really burdens the court and the parties with unnecessary action in this case when it can simply retain jurisdiction for a limited time period. This court has done something similar in the Idaho Conservation League. 811 F3D 502 provides clear precedent for ordering deadlines for agency action, retaining jurisdiction to enforce those deadlines for over eight years longer than what we have here based on a joint motion from the party. Mr. Evans, that's the only case in which this court has done that. It is fairly extraordinary. There might be some precedent for it, but it's a fairly extraordinary action for this court to just oversee the implementation of deadlines by a federal agency. Well, we think that actually there's, as all the parties provided in the May 2021 response to the motions panel show cause order, there are numerous cases where the D.C. Circuit has ordered deadlines and retained jurisdiction. I think one that is particularly appropriate here is Public Citizen Health Research Group v. Octor after a delay of three years ordering the agency to issue a notice of proposed rulemaking within 30 days and a final rulemaking on a priority expedited basis as promptly as possible. Indeed, and I think that there again the parties cite their May 2021 response to show cause order as numerous circumstances where the court has issued deadlines and retained jurisdiction. I will, Judge Rowell, I agree with you that normally they're much shorter, but a much shorter time frame. We wish they were a shorter time frame here, but the settlement agreement and consent order was a compromise by the parties and recognized the exigencies that the EPA represented in terms of complying with the ESA. So we, you know, entered into a compromise to find the deadlines that we thought would achieve our outcome. Where does our relief? Oh, go ahead. I was just gonna say, where does our authority come from to take that action? Do you think there are cases that do that? Do we have a statutory authority to do that? Well, the statutory authority in Endangered Species Act provides for clear authority for the EPA making that decision making within a bounded time frame, and we're not asking the court to engage in any type of administrative, you know, type of effort. We're just simply saying the court can provide a deadline like Congress did. Congress said, EPA, you need to consult before the registration, before the agency action occurs. We're asking the court to set a deadline. EPA, you need to act, and that's the end of what we're asking the court to do in terms of deadlines. And the statute says we can affirm or set aside the orders complained of in whole or in part. Correct. Either affirming or setting aside. I guess two things to get specifically to your states that the court maintains equitable discretion as well as legal discretion in terms of crafting remedies, and we also think that affirming and setting aside in whole or in part, you know, that the court can, you know, in part is allowing the decision to continue to remain on the books while the agency complies with the law, and we don't think that that is inconsistent with the statute. So you're just saying it's a slow motion affirm. It's like, we're affirming, but when certain conditions are met. So our action on the case ultimately before it's dismissed would be to affirm, if all goes well. If the EPA complies with the Endangered Species Act, which is stated well in the order that the court would affirm. That's the point of the consent order. Why, I mean, I know your Marin's briefing asked for vacature. You know, the EPA has acknowledged obvious failure to comply. What's the scenario there? If Judge Rouse, the implication of Judge Rouse's question is correct, that we don't actually have the option to enter the consent order and retain jurisdiction, vacate these certificates, and decide the case on that ground? Well, the settlement agreement doesn't, or the proposed order doesn't do anything to contravene that the presumptive remedy in circumstance like this is vacater. And as the court recently affirmed last year in the Standing Rock Sioux Tribe versus U.S. Army Corps of Engineers and Farmworker Association of Florida versus EPA, the presumptive and appropriate remedy for unlawful agency action is vacater. And we think that given the history of EPA's failure to comply with the Endangered Species Act, that vacater is the only other circumstance that would incentivize EPA to act. Because when this court remanded without vacater, EPA has still failed to comply with this court's order four and a half years after it issued it. And I see my time is up. I'm happy to answer any questions or save my remaining time for rebuttal. I think we'll give you your time for rebuttal. We'll hear from the government now. Thank you, Mr. Evans. Mr. Jacoby. Good morning, Your Honors. May it please the court. I'm Patrick Jacoby from the Department of Justice on behalf of EPA. Your Honors, EPA recognizes the seriousness of not meeting its ESA obligations when registering products under FFRA. Here, EPA has done its level best to identify dates for effects determination, to commit to those dates, and to resolve the four non-moot petitions. EPA has even, as Mr. Evans noted, completed its ESA obligations for one of the petitions. The court is not inclined to enter the proposed order to resolve the four non-moot petitions. EPA requests that the registrations be remanded to EPA without vacature for two main reasons. First, EPA's commitment to deadlines for effects determinations counsels against vacature. Second, the balance of the equities also counsels against vacature for reasons similar to those identified and discussed by this court in the 2017 decision regarding the active ingredient sanctuary note. Turning to the first point, EPA has negotiated, as you've discussed with Mr. Evans, a proposed order and settlement agreement in good faith has provided a sworn declaration of EPA's intent to meet the deadlines set out in that agreement. So this is not a case where EPA has refused to commit to deadlines at all. EPA has met the deadlines for ESA section 7 compliance in the proposed order for cuprous iodide during the pendency of these petitions and the pendency of the proposed order. EPA also more broadly has made and continues to make meaningful steps towards making its ESA obligation or meeting its ESA obligations on for registrations. These range from some of the programmatic efforts we discussed in our brief at pages 5 through 7 to the more recent announcement that EPA will include ESA analysis for new active ingredients prior to registration going forward. These are important steps and EPA is acting in good faith to address this problem. I wonder, I mean, I understand why the government does not want vacater here and I understand the difficulty of complying with these requirements and the time it takes and the resources and is the government concerned at all about the precedent that this type of that if we entered this consent order the precedent that would set? I mean we see cases all the time in the circuit about agencies failing to meet their deadlines and I don't know I mean this long-term consent order where we oversee how the EPA implements its various policy priorities, how it you know deals with limited resources and all the different reasons why there are delays in agency action. I mean does the government want this court to superintend those types of delays in agencies? I mean how do we distinguish this circumstance from others and I'm just interested in the government's institutional position about why the executive branch would want judicial oversight over this type of highly political and you know executive function of figuring out how to do interagency review with competing priorities. Your Honor, I'll try to answer the question without divulging any privileged information on behalf of the government. It is a concern and one that we take seriously. This section, the environmental defense section, appears before this court quite frequently in situations regarding petitions for review so it is something we've considered carefully. I think, Your Honor, our preference and our initial volley, if I recall correctly, was a stay during the pendency of these deadlines which is more in line with what we think this court has done in other situations. For example, I believe there's a stay in a case called DBA versus Nuclear Regulatory Commission at 492 F 3rd 421. That's a 2007 case. It's an open-ended years-long advance that's been going on for more than 10 years where there's an attempt to comply. Is that the waste case? I believe it is, Your Honor. It's nuclear waste. It's been a while since I looked at it but yes, I believe that's correct. That, I think, we would have said was the correct way to go. However, because of the vacature here and the fact that we don't have a merits defense, we had to weigh the potential risk of vacature, the potential litigation risks. We worked extensively with the petitioners to come up with what we thought was an acceptable procedure which was not a CD, for example, but a consent motion asking the court to enter a proposed order and retain jurisdiction under the I think what it provides that a stay doesn't is basically some of the benefits Mr. Evans identified regarding the website that they have set up with the registrants, some of the interim procedural pieces that allow them to meet and confer with the agency, that type of thing. I'm confused by that because those things are all required. I mean, they're not specifically chapter and verse but it's required by the statute that you meet and confer. It's required by the organized agency functions in a way that better enables it to meet the deadline so the website and the, you know, would be efforts that you don't need any court supervision or any consent order to have authority to take those steps. So I'm a little, I mean, I understand that they're productive and that the lawsuit has occasioned engagement among the parties now before the court but the Your Honor, I don't disagree. I mean, I think EPA could work with the petitioners to take those steps. I'm not sure that I, you know, as I sit here right now, I'm not sure that every single thing in the proposed order is necessarily required on behalf of EPA but certainly EPA could undertake all those steps and as its choice of how to better be better positioned to reasons why you were remanding without vacature and I think we interrupted you after you got through your first. First was that the EPA's commitment to deadlines sort of shows its good faith and bona fides and the second was you said the balance of the equities that's similar to the position in the 2017 case and I wanted to probe you more on the second. I mean, doesn't Standing Rock apply here? You know, if you skipped a required procedural step, we can't remand without vacature unless you've established that you were justified in skipping that step and I don't see an argument to that effect. How could we, in this case, remand without vacature under, given Standing Rock? Your Honor, I think that is a tricky question. I'll grant you that. So let me begin by saying I don't read Standing Rock to materially revise the court's analysis in the Scientron Oval Proposition which I think is the most applicable here given the statute, the facts, and the analysis and the record. So, you know, I think that's the easiest, shortest answer. I think the harder answer is, and I also think Standing Rock is distinguishable on the facts and the fact that it's an EPA case which, you know, I won't go into unless the court wants me to, but I think the more important question is I'm not sure I know how far this court intends to extend Standing Rock. Is it the case that if there's a minor notice error or required notice in any agency petition that that will require vacature? That would seem to take things too far, I think, and would maybe read Standing Rock more broadly than it's set out to be. So I think that would, that about sums up how I see things. I think the easiest answer is I don't think Scientron Oval Proposition is barred from application here after Standing Rock. This situation is different in terms of what, I mean, a number of ways. This situation is different from Scientron Oval Proposition? Is that the question? Yeah. Your Honor, the only, the main difference is that the court used the reduced risk designation as a shorthand in Scientron Oval Proposition. Reduced risk is not something that's done for every applied for use. It's actually usually done at, always done at the request of registrants who are seeking expedited review. So it's just a shorthand. We don't have that with respect to each of these four remaining chemicals, do we? No, you have it for one for many uses, but the larger point is just because there wasn't a reduced risk analysis doesn't mean that the products aren't actually less risky than the alternatives. And if you look at the record and what we've presented in our briefs, I'm happy to go through it. There is quite a bit of analysis of not only the environmental benefits through a reduction in risk compared to older alternatives, reduction in the use of those older riskier alternatives, and obviously food supply and benefits to growers that we think are very important, many of which translate into environmental benefits, reduction in tillage, reduction in application, improved water quality. I see that I'm almost out of time. So unless there are further questions, I will close and say we request that the court dismiss the Cooper's iodide petition as moot and remand the four remaining petitions to EPA without vacature. If the court chooses to set deadlines, we would of course request that those be the ones we agreed to in the proposed order. Thank you. Thank you, Mr. Jacoby. We'll hear from Intervenors Council now, Ms. Berman. Thank you, your honors. Good morning. We join EPA and petitioners in asking this court to enter the consent order. The settlement was the product of years of negotiation, and it does include meaningful commitments from my clients as well as EPA. If the court does not enter the consent order, many of the benefits of the settlement go away, including intervenors' provision of additional information on a website to educate growers on the location of endangered species and specific label requirements of these products that protect them. And your honors, I do not think that is... Can I ask you the outset? So you've raised a standing objection. Yes, your honor. I take it that if we were to agree with you on the standing objection, we couldn't enter the consent order. Your honor, I don't think the court needs to reach standing if it enters the consent order. This court has many times held cases in abeyance, which is what the consent order would do, waiting for EPA to take action without ever diving into the issue of whether there is a standing issue in that case before that issue is ever raised in brief. So if the court is... How is it different from Idaho in that respect? Because is there a standing analysis first? Sure. So your honor, in that case, it did. I don't think it's necessary. I would point the court to the American Chemistry Council versus EPA case from 2016, where the court held the case in abeyance while waiting for EPA to act to fulfill a settlement. I don't think there was any standing analysis there. Generally, if a case is being held in abeyance so that EPA can take an action that may move the case, that happens before there is any briefing on the case. If the whole idea behind our keeping it is that there's deadlines and then we retain jurisdiction so that those deadlines can be enforced, it doesn't matter if they're standing? Still doesn't matter? Your honor, so long as the court holds the case in abeyance, I don't think so. Now, if the court doesn't, if the court were to instead look at remanding with or without vacature, we do think it should reach the standing issue first. And I would like to mostly rest on my briefs in regard to that issue. Our key point was that it's petitioner's burden, as this court emphasized last year in the Food and Water Watch case, to put forth evidence showing that there will be redressability, that third parties will act in a specific way so as to alleviate the harm claimed, and we don't think they've done that. But your honors, what I would really like to take my time to do today is to urge the court that in no event should it vacate these registration decisions. Not only are they the result of decades of work and over $1 billion in collective investment by my clients here, the point of these individual active ingredients is that they are both more effective and less environmentally impactful than the alternatives that they replace. And EPA's so- Another difficulty that we have in this record compared with the record in the 2017 CBD case, where we don't have assertions by EPA that each of these pesticides is actually less risky. I think we have something close for fluperidiferone, but not for the others. For haloxamethyl, they only say that it may be better than older pesticides. So I just don't see how we can take your word for that on this record. Your honor, I would respectfully disagree, and I'd like to point you to specific places in the record that I think get us there for the other active ingredients. As DOJ counsel pointed out, the reduced risk label is a helpful shorthand, but it's not determinative on this issue. So for haloxamethyl, for example, at page 307 of the joint appendix, EPA explains that it has much lower use rates than the alternatives that it would displace, and it uses the word displace. EPA also explains, and you can see this ranging from pages 299 to 307, that it is less persistent in the environment, and it is practically non-toxic to animals as well as humans. For bicyclopyrone, for example, I would point the court to page 122 of the record, where EPA explains that because this active ingredient is much more- What page was that? 122, joint appendix 122. EPA notes that because it's more effective in smaller quantities, again, a lower use rate, one pre-emergent application can avoid multiple post-emergence applications of pesticide, resulting in a decrease in specific older, riskier pesticides, such as atrazine, is the one noted there, as well as several others by EPA. So, yes, well- Petitioners claim that EPA didn't consider indirect effects, joint effects by bicyclopyrone with multiple other active ingredients. So, we have competing characterizations on the record. We don't have a determination by EPA. I don't think we can de novo just credit evidence that's for EPA, and it hasn't done that. Your Honor, respectfully, I think EPA has done that. On synergism, the issue you note, in every one of these registration decisions, EPA addresses the speculation that there might be synergistic effects from mixing with other compounds. For example, at joint appendix page 300, EPA explains synergism is rare. It's only been found in limited circumstances. There are synergistic claims or suggestion of synergistic effects here. So, frankly, Your Honor, EPA did address these issues very thoroughly in the record, in the benefits documents, in the risk assessment, in the registration decision. And for each one of these active ingredients, it explained that they are improvements, that they are better than the older pesticides that they would replace. And so, vacature would have an impact here. That's at odds with the Endangered Species Act, just as was the case back in 2017 in regards to CTP. And so, in conclusion, Your Honor, since I see my time is up, my clients, they share many of Petitioner's values. These are chemistries that were designed to be both more effective and more targeted, lower risk to the environment, so that food production is sustainable long term. And so, we would ask the court first to enter the consent order negotiated by the parties which protects those values, but if not, above all, to vacate these registrations. Thank you. Thank you, Ms. Berman. Mr. Evans, we'll give you back the three minutes that you'd asked for for rebuttal. Thank you, Your Honors. I'll just briefly touch on some of the questions raised by the court and some of the issues raised by the other parties. First, Judge Rye, I apologize, I didn't have the slides on hand, but your question about the court's authority regarding the order to enter the deadlines, the Petitioner's and the OCAZA, that's at document 189-7864, pages 8 to 10 for Petitioner's. Intervenors, document 189-7868, pages 13 and 14. And EPA, 189-7888 at pages 7 and 8. Again, citing the Cobell versus Norton, the courts are presumed to possess the full range of remedial powers, legal as well as equitable, unless Congress is expressly restricted otherwise. Judge Feller, you asked about the settlement agreement regarding the websites. Importantly, that settlement agreement is between the Petitioner's and the Respondent's, and EPA has chosen not to waive sovereign immunity, which is why we need the consent orders, or the orders for deadlines from EPA in order to effectuate the settlement agreement. The court asked about this, and EPA cited to the Scientronola poll case, and in addition to the reduced risk issue, I really want to emphasize that the substitution theory is quite the red herring. There is no evidence that these pesticides would be substituted for more environmentally beneficial substances. Indeed, the registrations of some of these pesticide products are literally combined with more hazardous older pesticides, such as atrazine and 2,4-D. That's at Joint Appendix 150, 240, 345, and their labels emphasize that these pesticides should be combined in tank mixtures with older pesticides. That's at Joint Appendix 83, 85, 166, 246, and 354. And the evidence before this court is that new pesticide approvals is actually correlated with increased pesticide use. For the past 14 plus years where there's data, new pesticide approvals is actually correlated with increased pesticide use for corn and soybeans, some of the biggest crops in the United States. That's at Petitioner's Reply Declarations 175 to 181. So the substitution theory is quite problematic, and as Judge Pillard, you alluded to, you know, these pesticides work additively, so when you're affected by, when any organism is affected by multiple chemicals from so they will stress endangered wildlife, such as the whooping crane and sand, sand walk can give thoughts not reducing harm by adding more pesticides. And, you know, the issue with standing the cuprous iodide is a clear example that Petitioner's injuries are redressable. Their EPA took action, complying with the Endangered Species Act, eliminated the harms that were most problematic for imperiled and endangered salmon and other, and other fish. Petitioner's injuries were addressed, and that claim is no longer a lot. I'll rest on that. Of course, I encourage the court to enter the orders and effectuate the settlement agreement. Thank you very much. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Rao